1   P. "Mike" Palmer
2   18402 N. 19th Avenue, #109
    Phoenix, AZ 85023
3   602-513-3738 (intermittent cell)
    Pro Se

4               **IN THE UNITED STATES DISTRICT COURT**

5               **IN AND FOR THE DISTRICT OF ARIZONA**

6

7   Peter Michael Palmer, an
    individual

8                                          **CV-10-8209-PCT**

9                    Plaintiff,

10          vs.                            **FIRST AMENDED**
                                           **COMPLAINT***
11

12  Glenn A. Savona, individually and     (Title 42 §§ 1983, 1985, 1986)
    in his official capacity as Prescott
13  City Prosecutor & Jane Doe
    Savona, husband & wife; Dan           Request Jury Trial
14  Murray individually and in his
    official capacity as City of Prescott
15  police department employee &
    Jane Doe Murray, husband & wife;
16  Christine Keller, individually and
    in her official capacity as City of   * filed pursuant to
17  Prescott police department             F.R.Civ.P. 15(a)(1)(B)
    employee & Joseph Keller, wife &
18  husband; Melody Thomas-Morgan
    (f.k.a. Melody Bodine), an
19  individual; Mark M. Moore & Jane
    Doe Moore, individuals, husband
20  & wife; City of Prescott, an
    Arizona municipal corporation;
21  and John & Jane Does I-X
22
                     Defendants.
23

24                          INTRODUCTION

25  1.      This is an action for money damages (to be directed by the Court to the charities

26          of Plaintiff's choice) and declaratory relief pursuant to 42 U.S.C. §§ 1983,

27          1985(3), 1986 & 1988; the First, Second, Fifth and Fourteenth Amendment to

28          the United States Constitution; and the laws of the State of Arizona against the

1    Defendants named herein in their individual and official capacities.

2.   This action arises from a patently ridiculous misdemeanor charge of "criminal faxing." (More technically, a criminal charge of "Interfering with judicial proceedings" for ostensibly not complying with a Rule of Civil Procedure, not obtaining permission to serve legal papers via fax.) It was a convoluted charge, and a trial judge saw through it and rejected the charging theory in a pretrial ruling. The charge was eventually dismissed (terminated in favor of Plaintiff) days before trial on motion from the prosecutor "in the best interest of justice."

3.   But more critically, because the Defendant prosecutor stated (in evidence  he intentionally withheld) that he knew he did not have probable cause to bring charges, this is a case of malicious prosecution and abuse of process. Likewise, the other Defendants knowingly initiated a false prosecution. Further, they conspired against Plaintiff with the intent, and the ultimate effect, of depriving Plaintiff of his Fifth and Fourteenth amendment rights as retribution for his exercise of his First Amendment rights. Because the private party Defendants willfully participated in joint action with the State or its agents to deprive Plaintiff of his constitutional rights, liability attaches to them.

<u>JURISDICTION AND VENUE</u>

4.   Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343 & 1367 and pursuant to the Declaratory Judgement Act, 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over Plaintiff's causes of action arising under Arizona state law pursuant to 28 U.S.C. § 1367.

5.   Pursuant to 28 U.S.C. § 1391, venue is proper in this Court.

<u>PARTIES</u>

6.   Plaintiff PETER MICHAEL PALMER ("I" or "me" or "Plaintiff") is a naturally born male citizen of the United States, at all times relevant resides in Maricopa County, Arizona.

7.   But first and foremost, Plaintiff is one of those somewhat zealous Bible-

thumping, outspoken 'born again' Christians[1] which, as history demonstrates, the world loves to hate. This goes to class-based, invidiously discriminatory animus toward me by the various Defendants. (Or alternatively, I am a "class of one.")

8.      Defendants GLENN A. SAVONA ("Mr. Savona") and JANE DOE SAVONA are, at all times relevant, husband and wife residing in Yavapai County, Arizona. At all times relevant, Defendant Glenn Savona held the position of Prescott City Prosecutor. Mr. Savona is a criminal prosecutor. Part of his job is to determine whether there is probable cause to initiate a criminal proceeding against citizens, ultimately with the goal of obtaining equal Justice for all. Mr. Savona is the final arbiter for the City of Prescott on whether to initiate criminal proceedings or not.

9.      Further, he is the one who writes complaints for the Prescott Police/Attorney Liaison (Defendant Keller) to swear to. Even though she swears before a judge that what she's saying is true, she relies on Mr. Savona's word that what he's told her is true. (And/or that he's told her the whole truth.) As such, Defendant Keller has abdicated her responsibility to cross-check Mr. Savona's veracity. In essence, she is just Mr. Savona's rubber stamp. As such, without any check and balance, Mr. Savona is the final policy making authority when it comes to initiating criminal complaints brought before him.

10.     Mr. Savona is a member of the Arizona State Bar, license No. 001969. As such, he swore an oath to support both the U.S. and Arizona constitutions, as well as to obey Arizona Supreme Court Rule 81, a.k.a. the Ethics Rules. ("E.R.")[2] All

---

[1] "Jesus declared, 'I tell you the truth, no one can see the kingdom of God unless he is born again.'" John 3:3

[2] Specifically Mr. Savona swore an oath, presumably to God, that (in part) "I do solemnly swear that I will support the Constitution of the United States and the Constitution of the State of Arizona; I will maintain the respect due to courts of justice and judicial officers; I will not counsel or maintain any suit or proceeding that shall appear to me to be without merit or to be unjust; I will employ for the purpose of

1  actions taken by Defendant Glenn Savona were on behalf of the marital

2  community.

3  11.  I have never spoken with Mr. Savona. However, based on his actions against me

4  as detailed in this Complaint, it's clear he harbors animus toward me.

5  12.  As an aside, it should be noted that Mr. Savona's colleague, Mr. Thomas Lloyd,

6  has filed a Supplement to one of the police reports mentioned herein (DR 09-

7  4718-005) and as such is a potential witness or potential Defendant. Also

8  according to Defendant Thomas-Morgan's sworn statement to the Prescott court,

9  Mr. Lloyd has given legal advice to Defendant Thomas-Morgan as to how to

10  prosecute me in a somewhat related civil matter.

11  13.  Defendants DAN MURRAY ("Mr. Murray") and JANE DOE MURRAY are, at

12  all times relevant, husband and wife residing in Yavapai County, Arizona. Mr.

13  Murray is a civilian employee in the Prescott Police Department. That is, he is

14  not a sworn police officer, not an AZ POST (Peace Officer Standards &

15  Training) certificated peace officer. Conceivably he is no longer under oath to

16  the state to uphold anything.

17  14.  During the time relevant Mr. Murray was assigned by the Prescott Police

18  Department to be Defendant Thomas-Morgan's personal liaison "officer."

19  (Despite there being no law in Arizona calling for this special service for

20

21

22

23  maintaining the causes confided to me such means only as are consistent with truth and

24  honor; I will never seek to mislead the judge or jury by any misstatement or false
statement of fact or law; I will abstain from all offensive conduct; I will not advance

25  any fact prejudicial to the honor or reputation of a party or witness, unless required by
the justice of the cause with which I am charged; I will never reject, from any

26  consideration personal to myself, the cause of the defenseless or oppressed, nor will I

27  delay any person's cause for greed or malice; I will at all times faithfully and diligently
adhere to the rules of professional responsibility and a lawyer's creed of

28  professionalism of the State Bar of Arizona."

1  women, nor any AZ POST policy about it.[3]) Even Miss Thomas-Morgan's

2  minor children (over which she was given sole custody after she left her

3  husband) have had Mr. Murray's phone number stored in their cell phones'

4  speed dial. As such, complaints by women have been given special status within

5  the Prescott Police Department. Which implies reverse discrimination against

6  those of use who are not women—like this Plaintiff. All actions taken by

7  Defendant Murray were on behalf of the marital couple.

8  15.  Except for briefly cross examining Defendant Murray during a civil trial, I have

9  never spoken with him. Despite this, he recently wrote in an email to Defendant

10  Thomas-Morgan "I hope he [Plaintiff] crawls in a hole." He has been writing

11  police reports on behalf of Defendant Thomas-Morgan for about six years now,

12  pretty much reporting as gospel what she tells him and consistently

13  misrepresenting material facts against me. (He also consistently misreports facts

14  against Thomas-Morgan's ex-husband, also an outspoken Christian.)

15  16.  Defendants CHRISTINE KELLER ("Mrs. Keller") and JOSEPH KELLER are,

16  at all times relevant, wife and husband residing in Yavapai County, Arizona.

17  Mrs. Keller was, during the time relevant, a civilian employee in the Prescott

18  Police Department. She acted as Liaison between Detectives and the County

19  Attorney. As such, it was often her job to personally appear before judges on

20  behalf of prosecutors and personally swear out criminal Complaints

21  (presumably before God) that it was her belief that certain citizens had

22  committed certain crimes. On information and belief, her information and belief

23  came solely from the prosecutors.

24  17.  Defendant Miss Melody Thomas-Morgan, formerly known as Mrs. Melody

25  Bodine ("Thomas-Morgan" or "Mrs. Bodine"), during the time relevant (and

26

27  [3] To this day, Miss Thomas-Morgan has unfettered access to Mr. Murray in the

28  P.D., even though Miss Thomas-Morgan does not have any criminal Orders of
   Protection in place.

continuing) is a divorced woman, a private individual. Before, during and after the time relevant, Mrs. Bodine/Miss Thomas-Morgan would run, and continues to run to Mr. Murray at the Prescott police for "help" and legal advice about how to deprive me of various Constitutional rights. (First, Second, Fourth, Fifth and Fourteenth Amendment.)

18. Before she left her husband, Defendant Thomas-Morgan and I were acquaintances for ten years or so. I house-churched with their family and sometimes overnighted before worship. Their oldest son evangelized with me one evening. But ever since she initiated divorce proceedings against her husband (a sin, according the God of the Bible), she has openly expressed hatred toward me. In the time frame of this Complaint, she once looked directly at me from the witness stand in court and, when no one else was looking, twice demonically in sotto voce said "F*** You!" to me in rapid succession.

19. Defendants Mark M. Moore and Jane Doe Moore are, at all times relevant, wife and husband residing in Yavapai County, Arizona. During the time relevant, Mr. Moore was Mrs. Bodine's divorce attorney and Mrs. Bodine retained him strictly for her divorce. Mr. Moore is a licensed attorney, Bar No. 004346 who focuses on "Administrative Law, Family/Domestic Relations, Probate & Trust Law." (I.e., civil, not criminal law.) Mr. Moore has sworn the same oath as Mr. Savona, and is similarly obligated by the E.R.'s as to honesty, integrity, etc.

20. I have never spoken with Defendant Mark Moore. But early on, when he took over Defendant Thomas-Morgan's divorce trial, I sent him a Christmas card. I told him I was concerned for his soul. That while he might win the instant lawsuit, "what does it profit a man if he gains the whole world but forfeits his soul?" (Mark 8:36 in the Bible.) The only encounter I've had with Mr. Moore was a creepy one in a courthouse lav. He has heard me singing hymns to myself before Defendant Thomas-Morgan's trials and I have observed at those trials that he has a visceral hatred for sound Christian principles. (If not sound

1    Christians proper.)

2    21.    Recently Mr. Moore sent Miss Thomas-Morgan an email her ex-husband had

3           sent to Mr. Moore in error. A printout of that email appeared in a Prescott P.D.

4           public record request for Miss Thomas-Morgan. The Prescott P.D. is keeping a

5           dossier on Mr. Bodine and me, two people the former Mrs. Bodine hates.

6    22.    Defendant CITY OF PRESCOTT is, at all times relevant, an Arizona municipal

7           corporation, located in Yavapai County, Arizona. At all times relevant, the City

8           employed Defendants Glenn Savano, Dan Murray and Christine Keller.

9    23.     Defendants, JOHN and JANE DOES I-X are, at all times relevant, husband and

10          wife residing in Yavapai County, Arizona. Plaintiff will seek leave of the Court

11          to add their true names once their identity has become known.

12                                **GENERAL ALLEGATIONS**

13                          <u>FIRST AMENDMENT UNDERPINNINGS</u>

14   24.    May the Court please bear with me as it is necessary to go back a few years

15          (before this instant action began) to establish my underlying First Amendment

16          claims.[4] I have never lived in Prescott or its environs. Nonetheless, the

17          beginning of all my problems with all the Defendants in Prescott can be traced

18          back to Defendant Thomas-Morgan when she was still a married woman, f.k.a.

19          Mrs. Bodine.

20   25.    Sometime in the summer of 2004, while I was visiting the Bodine family at their

21          previous residence in Humboldt, Arizona, Mr. Bodine told me he and his wife

22          were having "marital problems." He did not elaborate. He asked if I would pray

23          for them. (Which I did.) Ominously, that was the last time I ever visited the

24          Bodines as a family.

25   26.    Because as a zealous Christian I honor the Biblical doctrine of "headship

26

27

28
_____

[4] Freedom of speech and free exercise of religion.

authority,"[5] I purposely had no contact with Mrs. Bodine since then, not wanting to interfere with another man's wife, especially in matters touching their marriage.

27.    Even though they were having marital problems, shortly after my last visit in the spring of 2005, the Bodines moved from Humboldt to Prescott. (Actually, just outside the city limits.) As above, I had never visited them at their new residence.

28.    Sometime in the fall of 2006, Mrs. Bodine served papers without Notice on Mr. Bodine, initiating legal separation/divorce proceedings. Their first hearing was held on October 12, 2006.

29.    Wanting to hear for myself both sides of their stories, I attended that hearing. (And most all their other hearings over the next two and a half years.)

30.    While at the time I had not taken a side in their divorce, God is clear in the Bible that He hates divorce.[6] Since it was Mrs. Bodine who initiated the divorce, and since she hadn't alleged that Mr. Bodine had committed adultery, and since I had to sit on one side of the courtroom or the other, I sat on Mr. Bodine's side. Still, I purposely have not had any personal contact with Mrs. Bodine from before then to this day.

31.    Nevertheless, shortly after the first hearing for their divorce, I received an unsolicited letter from Mrs. Bodine. (That is, she made contact with me.) Among other things, she claims my presence in court "hurt" **her** children (even though the minor children weren't there) and suggested to me that "maybe you should mind your own business."

32.    Backtracking a bit, coincident with her filing papers against her husband, Mrs.

---

[5] "For the husband is the head of the wife as Christ is the head of the church, his body, of which he is the Savior." Ephesians 5:23

[6] Malachi 2:16.

Bodine got an ex parte Order of Protection against Mr. Bodine.[7] As a result, she was assigned Defendant Murray as a personal liaison officer at the Prescott Police Department even though there is no law calling for it nor AZ POST policy.

33.    Shortly after she obtained the OOP, Mrs. Bodine called 911 numerous times against her husband, claiming he was violating the OOP. (As when he'd attend a soccer game to watch their kids, or go to one of their children's graduations.) Mr. Bodine had never violated the OOP and was never arrested for same.

34.    In emails to Mr. Bodine, Mrs. Bodine frequently referred to her "friends" in the police department.

35.    As it goes to a holistic review of this entire complaint and prior bad acts of the Defendants, in January 2009, the Prescott Police illegally seized me at the sole request of Mrs. Bodine. An audio record of the 911 dispatch tape shows that Mrs. Bodine made a private cell phone call to Prescott police officer Cook, "dispatching" him to Mr. Bodine's residence where I was visiting that day. Immediately after her call to Officer Cook, he is heard on the tape requesting directions to an out of town address. (Mr. Bodine's residence.) As I result of the illegal Fourth Amendment seizure, I brought a federal civil rights lawsuit against the City of Prescott and various police officers.[8] The City subsequently settled with me. (See Exhibit 1, story from the *Prescott Daily Courier*.)

36.    The purpose of the seizure was to accommodate Mrs. Bodine in finding me so she could serve papers on me. For on the day of that seizure, I was served with an ex parte civil Injunction by a private process server. (I only sporadically visited Mr. Bodine, and as a missionary, don't have a residence per se.)

---

[7] Even though she testified in court he had never been physical with her. Only that he would try to reason with her with words.

[8] *Palmer v. City of Prescott, et al.*, CV 10-8013-PCT

37.  I challenged the Injunction in court. While Defendants' counsel will no doubt gleefully point out I lost, even after appeal, Mrs. Bodine's statements from court are instructive for this instant Complaint as it goes to First Amendment issues. [9]

38.  To wit, Mrs. Bodine told her judge "Finally, in closing, no one has the right or privilege to force their opinions, their belief, or their convictions on another person and call that opinion, belief, or conviction God's will. This is abuse in the name of religion, and it should not be tolerated."[10]

39.  In turn, Mrs. Bodine's judge, Judge Mary Hamm, framed the issue when she lectured me about the supposed "restrictions" on the First Amendment.[11] Judge Hamm said, "**And given your statements about [the] First Amendment, the right to free speech and right to express your opinions**, I can't help but think you'd also express that opinion to these minor children."

40.  Even though I haven't expressed my opinion about Mrs. Bodine to their minor children (again, respecting their father's headship authority), Mrs. Bodine has never wanted me speaking to their children ever since she filed papers against her husband. Per a letter she wrote to Defendant Murray, her reason for not wanting me about the children is that she doesn't want me talking to the children about her and her spirituality. (Or lack thereof.)

---

[9] There were several irregularities at trial in the Prescott Justice Court. Among them was new "evidence" cited by the judge at trial that had never been served on me. Later, two witnesses and I exhaustively searched the court file and found a secret document, not mentioned at trial that had been slipped into the record with others, absent any Notice of Filing. Tampering with a public record is a class 6 felony in Arizona. But Yavapai County prosecutor Sheila Polk refuses to investigate the incident, claiming a conflict of interest.

[10] Quoting from certified trial transcript, *Bodine v. Palmer*, 20081217J in the Prescott Justice Court, April 9, 2009.

[11] I say "her judge" because, contrary to *Band's Refuse Removal v. Borough of Fair Lawn*, Judge Hamm prosecuted Mrs. Bodine's case for Mrs. Bodine. Mrs. Bodine did not call any witnesses or question them. Judge Hamm did it all for her. In fact, the Court reporter calls them "the Court's witnesses."

41. Even as recently as August 2011, the former Mrs. Bodine wrote in an email to Defendant Murray "He [Plaintiff] does not have all the freedom he thinks he has under the First Amendment. Yeah!"

## THE INSTANT ACTION

42. On January 23, 2009, immediately after Defendant Thomas-Morgan (still Mrs. Bodine then) had "dispatched" a Prescott police officer to seize me, I was served with an ex parte temporary Injunction Against Harassment by Mrs. Bodine.[12]

43. Since I had not had any contact with Mrs. Bodine in the years since (and even before) she first filed papers against her husband (as Mrs. Bodine acknowledged later in court), there was no cause for an injunction against me. The ex parte injunction also interfered with Mr. Bodine's parental rights by dictating to him that I could not be around his children on his visitation day.[13] Mr. Bodine wanted me to challenge this. So I filed papers as a pro se for a challenge hearing in the Prescott "Justice" Court.

44. While Mrs. Bodine had a divorce lawyer at the time (Defendant Moore), she was ostensibly representing herself in the injunction.

45. Curiously, though, her pleadings at the time were more conforming than mine—double spaced on a legal pleading template. She even sought $5000 in sanctions against me in one of "her" responses to one of my motions! On information and belief, Defendant Moore was helping, or had caused his office staff to help Mrs. Bodine prosecute her civil injunction against me.

46. Before trial I filed many motions. Acting as my own attorney, I mailed copies of

---

[12] Arizona's ex parte civil injunction statute is arguably unconstitutional as it specifically declines to comport with the constitutional safeguards in Fed.R.Civ.P. 65. As such, it arguably violates the Fourteenth Amendment, since it is devoid of due process.

[13] Thus, by modifying a parental right, the injunction violated the Arizona Rules of Protective Order Procedure.

all motions and paperwork to Mrs. Bodine as required by Rule 5(a) of the
Arizona Rules of Civil Procedure (binding on Justice Courts per A.R.S. § 22-
211). The Injunction paperwork clearly allowed contact "through attorneys" or
"legal process." (The latter which I didn't know at the time is a term of art. I
took it literally to mean "anything involving the process of litigating.") Further,
A.R.S. § 12-1809 (which governs harassment law) defines harassment as an act
which serves "no legitimate purpose." Clearly, sending your opponent court
paperwork is a legitimate act. And common sense.

47.     Even though there was an address listed for Mrs. Bodine in the Injunction, I
couldn't be sure it was still valid. For Mrs. Bodine had shocked us in divorce
court when we learned serendipitously on cross examination that Mrs. Bodine
had recently vacated her primary residence without telling anyone. (But still
having Mr. Bodine drop the children off at the empty house so no one would
know she had absconded.) Given her erratic behavior, and not sure where she
really resided, I thought it best to mail all legal paperwork in care of the First
Baptist Church of Prescott where Mr. Bodine said she worked. That church
group was supporting her in her sin and had given her a job. I was careful to
write "Legal Process Exclusion" on the front of the large manilla envelopes to
avoid any problems.

THE FAX

48.     Having seen real attorneys fax each other motions in addition to mailing them, it
was my belief that I was also required to fax Emergency Motions to Mrs.
Bodine so she could have ample time to respond. Even if faxing an Emergency
Motion wasn't required, it seemed to me to be a courtesy, buying her a day or
two to contemplate a response. But before doing so I checked with my legal
adviser first.

49.     See, when Mrs. Bodine had filed divorce papers against her husband, she also
obtained an ex parte criminal Order of Protection against him. (A tactic I've

1   since learned divorcing women often deploy.) In her emails to Mr. Bodine, Mrs.

2   Bodine frequently referred to "her friends in the Prescott Police Department."

3   She routinely used the OOP to bully her husband, calling the police on him at

4   the drop of the hat for bogus causes. (Mr. Bodine was never charged for

5   violating the OOP against him, even though Defendant Murray wrote up at least

6   one report for charging against him.) Given her history of malicious prosecution

7   of her husband, I was concerned Mrs. Bodine would similarly contact the police

8   claiming I violated the ex parte injunction if I sent her the required fax.

9   50.   So, to make doubly sure I wasn't violating the injunction, I contacted an attorney

10      I hired just months before about these matters, so I could know best how to

11      proceed. (In fact I had consulted with him in January when I was served the

12      Injunction.) I explained to him that I thought it was a requirement to fax an

13      emergency motion. I explained my fear that Mrs. Bodine would run to the

14      police telling them I had violated the Injunction, whether true or not. To assuage

15      my concerns, my attorney sua sponte offered to fax my motion on my behalf.

16   51.   So on February 4, 2009, after he reviewed my first Emergency motion, my

17      attorney faxed of that motion a copy to Mrs. Bodine. His secretary contacted me

18      for details and I gave the secretary what I believed to be a dedicated fax number

19      for Mrs. Bodine at the church office where she worked. As such, I didn't see a

20      need for the secretary to fill in a cover sheet, although she sent a cover sheet

21      anyway, albeit mostly blank. I saw no need for confidentiality if I were wrong

22      about the fax number not being a dedicated machine in Mrs. Bodine's office

23      since the motion was public record anyway, and since this was a church, where

24      everyone is supposed to be one.

25   52.   There were no immediate repercussions from faxing that I knew of at the time.

26      Thus it confirmed my belief that faxing time-critical motions was a legitimate

27      act and did not violate the injunction.

28   53.   About a month after the first fax, when I filed another Emergency motion with

the JP court, I again faxed a copy of that motion to Mrs. Bodine. But this time I had to send the fax myself, since my counselor attorney was on a cruise and could not review/approve my motion for sending. Still believing the need to fax an Emergency motion a requirement of law, but hoping to mitigate Mrs. Bodine's malicious tendencies, I wrote on the cover sheet, "Per man's law and God's." I sent this second fax on March 13, 2009.

54.    It should be noted that in the five weeks between these two faxes, I had filed some non-time critical motions with the court as well. I did not fax those to Mrs. Bodine. I only faxed time-critical motions, which I believed I was required to do by law.

<u>THE POLICE RESPONSE</u>

55.    Unbeknownst to me at the time, immediately after the first fax in February, Mrs. Bodine had, true to form, run to Defendant Murray, her personal police officer at the Prescott Police Department, claiming I had violated the Injunction when my attorney faxed the first motion.

56.    Defendant Murray instantly generated two police reports out of this same incident. One was Supplement 005 to an old DR (DR 08-50969), where it had been shown in court that Defendant Thomas-Morgan had given a false maiden name to Defendant Murray with the intent to incriminate me.

57.    The other DR was DR 09-4718. Per Mrs. Bodine's claim, Defendant Murray wrote in his police report that I "knowingly interfered with the judicial proceeding of the Prescott Justice Court" by faxing court papers.

58.    Among other mischaracterizations,[14] he reports that I did not contact Mrs. Bodine's attorney. (Defendant Moore.)[15] But, true to form when reporting about

---

[14] Not to mention outright false/incorrect statements of "fact."

[15] Hopefully Mr. Murray is not reporting hearsay from Mrs. Bodine as fact. Therefore, it must be that he had contacted Mr. Moore directly to state this as fact.

me (or Mr. Bodine), Mr. Murray conveniently overlooked the fact that Mrs. Bodine did not have an attorney representing her in the injunction. She was a pro se litigant. Contrary to Defendant Murray's inference then, there was no attorney in Mrs. Bodine's injunction to contact. Nevertheless, this substantiates my information and belief that Defendant Moore was, in fact, involved in Mrs. Bodine's injunction proceeding, albeit unofficially and pro bono.

59.  Nevertheless, with this and other spin, Mr. Murray forwarded his conclusionary report to Mr. Savona for charging, titling it "MISC" for Misdemeanor Crime.

60.  Presumably, I would have been arrested on sight for ostensibly committing a misdemeanor. But, as Defendant Murray wrote in his reports, my whereabouts were unknown, especially since I don't live in Yavapai County.

61.  Immediately after I faxed the second fax, Defendant Thomas-Morgan ran to Defendant Murray who again dutifully wrote up a police report asking for criminal charges alleging I knowingly violated a court order. (DR 09-11832)

### IT'S A CRIME

62.  Sometime in March, Defendant Savona wrote up a criminal Complaint and fed it to Defendant Keller. Taking Mr. Savona's word as her only basis of "fact," she, in turn, (falsely) swore to Prescott JP Judge Markham that I "knowingly disobey[ed] or resist[ed] a lawful order, process or mandate of the Court" by faxing "papers to the workplace of the protected party without fulfilling requirements of Rule 5(C) of the Arizona Rules of Civil Procedure." (Lawyers can't believe it when I tell them this story.)

63.  Mr. Murray never mentions Rule 5(c) of Arizona Rule of Civil Procedure in his report as grounds for criminal faxing. The applicability of Rule 5(c) aside, the fact is that neither Mr. Murray nor Mrs. Bodine are familiar with the Rules of Civil Procedure.

64.  In a personal note to Defendant Murray regarding court paperwork she had just received from me in the mail, Defendant Thomas-Morgan tells Defendant

1   Murray, "Obviously I have not read this. . . . If I need to act [on] anything or

2   take anything to my lawyer, please let me know." (See Exhibit 2.)

3   65.   Again, Defendant Moore is Defendant Thomas-Morgan's "lawyer," even though

4   he was only hired and paid to do her divorce.

5   66.   Mrs. Kelly only swears out what Mr. Savona writes, and Mr. Savona is a

6   criminal prosecutor not well versed in nuances of civil procedure.

7   67.   On information and belief, Defendant Moore contacted Defendant Savona

8   directly (or indirectly by way of Defendant Thomas-Morgan) suggesting to

9   Defendant Savona he (Savona) could hang me on a violation of Rule 5(c).

10  68.   In late March I received this criminal complaint at my mail box at the Post

11  Office. Stamped March 19, 2009, it indicated I had been charged with A.R.S. §

12  13-2810(A)(2) for "knowingly" violating a court order.

13  69.   The penalty was $460 and apparently no jail time. (Although the latter was not

14  in writing. I've since learned that no jail time can be used by a prosecutor as a

15  trick to prevent an IFP litigant from obtaining a public defender. Which of

16  course makes it easier for the Prosecutor to win.)

17  70.   I was never prosecuted for sending the second fax, which I did on my own,

18  without an intervening attorney. If faxing had truly been criminal, it follows that

19  this charge for the second fax would have been easier to prosecute against me

20  than the first since I did not do it "through attorney."

21  71.   As a proximate result of the criminal charge for criminal faxing, I was forced to

22  place a large, non-refundable deposit of $5500 to retain my attorney for trial, in

23  addition to a $100 consultation fee and about $100 in gas money for travel. (For

24  a total damages of $5700.)

25              FIRST JUDGE DOES NOT SEE A CRIME

26  72.   It is not really necessary to get into the minutia of whether Rule 5(c) applies or

27  not. Even if Rule 5(c) applied as will be evident below, Mr. Savona knew

28  before he filed the criminal complaint that he did not have probable cause to do

1    so, because the overarching element in A.R.S. 13-2810 is "knowingly." In this

2    case, ignorance of the law IS an excuse.

3  73.  On its face, I did not know I could be violating the injunction by faxing these

4    two time-critical motions. I did not know I was doing anything wrong since

5    even my attorney said it was okay to fax and even faxed a motion for me.

6  74.  Even Mr. Savona knows this. For in a police report which he withheld from us

7    regarding the second fax (DR-09-11832), he acknowledged I didn't know I

8    wasn't supposed to fax.

9  75.  But for the record, Rule 5(c)(2)(D) is about alternate methods of service other

10    than U.S. Mail. To wit, "Service in General. A paper is served under this rule by

11    . . . delivering the paper by any other means, including electronic means, if the

12    recipient consents in writing to that method of service . . . in which event

13    service is complete upon transmission." Note that what I faxed could not be

14    considered service, since I had mailed Mrs. Bodine a copy of the emergency

15    motion as service.

16  76.  As it goes to probable cause, no court had ruled that I had violated the

17    Injunction nor violated Rule 5(c) of Civil Procedure by faxing a copy of a

18    motion to Defendant Thomas Morgan. Judge Markham, who issued the ex parte

19    injunction for Defendant Thomas Morgan, and who heard the criminal

20    complaint alleging I had violated his injunction, could have ruled sua sponte

21    that I violated his injunction and held me in contempt. But he didn't because

22    there was no grounds to do so.

23  77.  Instead, to my surprise, on March 25 I received a phone call from JP Judge

24    Arthur Markham's clerk, Cynthia Runner with an ex parte communique from

25    the judge. To my extra surprise, despite the clear requirement of Rule 5(a) and

26    the exclusions in injunction law for same, she said that Judge Markham told her

27    to tell me that I was not to mail copies of court paperwork to my adversary. That

28    to do so in the future would result in criminal sanctions. (This was put in writing

1       later in a Nature of Proceedings printout.)

2   78.     Implicit in Judge Markham's new instruction then is "knowingly." Ignoring for

3           now that Judge Markham's new instruction patently violated the Rules of Civil

4           Procedure, if he really believed that "no contact" meant I couldn't mail court

5           paperwork to my adversary, he could have prosecuted me at the time for

6           violating his injunction of no contact by having previously mailed copies of

7           paperwork to Mrs. Bodine.

8   79.     But Judge Markham didn't prosecute me because he knew that, until his phone

9           call, I could not have known that, in his world, I wasn't supposed to serve copies

10          of court paperwork on my adversary in a civil matter.

11  80.     Caught in a Catch-22 (either obey the law and go to jail or forfeit the right to

12          defend myself?), I stopped mailing legal paperwork to Mrs. Bodine.[16]

13          Immediately after this, I filed a Rule 42(f) Notice for a change of judge—an

14          automatic one time right in Arizona—away from Judge Markham for my

15          upcoming injunction hearing. As such, Judge Markham was obligated to recuse

16          immediately on March 31.

17                              SECOND JUDGE CONCLUDES NO CRIME

18  81.     Again, it's not really necessary to get into the minutia of Arizona R.Civ.P. Rule

19          5(c) because the overarching element of the crime I was charged with is

20          "knowingly." As bottom, Mr. Savona knew I did not act "knowingly." Which

21          makes the minutia moot. But more fundamentally, there wasn't probable cause

22          to charge me with a crime because, as a new judge ruled, faxing court

23          documents did not violate the injunction on its face.

24  82.     Here's what Judge Ray II wrote about it in a ruling dated August 3 (emphasis

25

26  _____

27          [16] Judge Markham did not offer an alternative for not complying with Rule 5(a).
    I ended up incurring the expense of having to pay the Prescott Court to forward copies
28  of my motions and pleadings to Mrs. Bodine. To the best of my knowledge the JP court
    never made Mrs. Bodine pay to have her pleadings sent to me.

mine.):

> The methods by which service may be effected are set forth in Rule 5(c), Arizona Rules of Civil Procedure. Service by facsimile transmission, or other form of electronic transmission, is ineffective absent written consent by the recipient. **Ineffective service does not, *ipso facto*, mean that the transmission is, in and of itself, illegal.** Rather, it just means that it is ineffective as service. **Review of the IAH Order reflects that the legal process is exempt from the "no contact" Order. It appears that the document that was transmitted was a document fairly within the meaning of legal process** that, by operation of Rule 5(c) [Az.R.Civ.P.] was to be served upon the [Mrs. Bodine] by one or more of the authorized manners of service as set forth in Rule 5(c) [Az.R.Civ.P.].

> . . . In the present case, had the document communicated to the Plaintiff not been a document filed with the Court **and clearly intended as legal process**, but, rather, had been a writing to harass, annoy, alarm, threaten, defame, slander or frighten the Plaintiff and was sent via an attorney, this Court would have no difficulty piercing the veil of attorney-client privilege.

83. Substantively then, there could not be probable cause to charge for a crime because there was no grounds for it.

84. Nevertheless, Mr. Savona did not move to dismiss the case immediately after this ruling. Instead, he fought like hell, filing a motion for reconsideration (of attorney-client privilege). This was a considerable unusual effort for a first time offense of a tenuous Class 1 misdemeanor of $460 and no jail time.

<u>WILLFULLY WITHHOLDING EXCULPATORY EVIDENCE</u>

85. The Supreme Court requires a prosecutor turn over all exculpatory evidence sua sponte per *Brady v. Maryland*. Arizona's Ethic Rule 3.4(d), and especially 3.8(d), require same.

86. In mid-May, my criminal attorney requested all exculpatory evidence in our disclosure request, and even provided Mr. Savona with a Brady/Kyles checklist.

87. We received a packet of disclosure information from Mr. Savona shortly thereafter. It was the only information we would receive.

88.   But on October 1, 2009, after a motion to dismiss had long ago been filed, and only a few weeks before trial, I discovered exculpatory evidence on my own in the form of Prescott police report DR 09-11832. Written on March 26, this was the mysteriously missing police report I expected the ever ready Defendant Murray would write after I had sent the second fax.

89.   The DR for the second fax read basically the same as the DR for the first fax, claiming a misdemeanor offense for "knowingly" violating a court order. This DR for the second fax had an end date of mid-April, before my attorney filed a request for all exculpatory evidence and before Mr. Savona ostensibly sent same.

90.   But in that DR regarding the second fax, Mr. Savona declined to file charges for the second, arguably more prosecutable fax, stating "the complaint [for sending the second fax] was denied because [Palmer] had not been served with the previous complaint by the time of the second action. **[He] knows now** the state will prosecute for a violation in the future." (Emphasis mine.)

91.   By so saying, Mr. Savona admitted that "knowingly" is a requisite mens rea for criminal faxing. And more important, Mr. Savona admitted he knew I didn't know I wasn't supposed to fax when I did.

92.   Mr. Savona chose not to release the DR regarding the second fax because it was proof that I had no prior knowledge, until that time, that I could be in violation of the injunction. It was damning and would've destroyed Defendant Savona's case about the first fax, exonerating me of all charges.

                    KNOWINGLY PRESENTED FALSE DOCUMENT TO COURT

93.   Nevertheless, knowing that I did not know I wasn't supposed to fax, Defendant Savona prepared a fraudulent complaint for Defendant Kelly to swear to.

94.   By preparing a Complaint for Defendant Kelly to swear to, swearing I knowingly disobeyed a court order when he knew I didn't, Mr. Savona not only intentionally falsified a document (a felony in Arizona), he caused another to

1    perjure herself before the Court.

2    95.    Arizona's Ethic Rule 3.3(a) says "A lawyer shall not knowingly make a false

3    statement of fact or law to a tribunal or fail to correct a false statement of

4    material fact or law previously made to the tribunal by the lawyer."

5    96.    Arizona Ethic Rule 3.8(a) says, "The prosecutor in a criminal case shall: refrain

6    from prosecuting a charge that the prosecutor knows is not supported by

7    probable cause;"

8    NO REMORSE

9    97.    Despite knowing he did not have probable cause in the first place to initiate this

10    action, and despite being told in Judge Ray's ruling he did not have probable

11    cause to continue this action, Mr. Savona postured and offered my attorney a

12    plea. Having done nothing wrong, and not wanting to lie that I did (to cop a

13    plea), I declined the offer.

14    98.    On November 2, 2009 the criminal faxing charge, being bogus, was dismissed

15    by the Court "for the reason that it is in the best interest of justice . . ." per an

16    un-stipulated motion to dismiss by Mr. Savona on October 30, 2009.

17    99.    Even though I did not agree to any plea or agreement, in the proposed, un-

18    stipulated Order that Mr. Savona lodged with the court, he spun the dismissal by

19    adding the phrase ". . . as the Defendant is completing a deferred prosecution

20    agreement." That was another false statement to the Prescott court by Mr.

21    Savona.

22    INSULT TO INJURY

23    100.    As a proximate cause of this prosecution, my Second Amendment right (and my

24    Arizona Constitution Article 2, Sec. 26 right) was revoked from the time of

25    arraignment to dismissal.

26    101.    I have seen Judge Markham set release conditions in similar cases before. Even

27    though he was obligated by the Code of Conduct to recuse before arraignment

28    because he had previously recuse himself from a case of mine (as my attorney

1   reminded him as pretrial), Judge Markham delayed recusal to give me his usual

2   "no drinking alcohol" release condition. Curiously, despite not having said it, a

3   "no weapons" release condition was in the Order when the clerk printed it out in

4   court.

5   102.   We immediately went back into the courtroom in a good faith effort to correct

6         this "oversight." My attorney pointed out that I had not been charged with a

7         violent crime, that the only "weapon" here was a fax machine, that I live 100

8         miles away, and there was no need for these draconian release conditions.

9   103.   Judge Markham turned to Mr. Savona, who had no problem relinquishing the

10        alcohol restriction immediately. But Mr. Savona refused to budge on the gun

11        ban.

12  104.   Judge Markham, unknowingly acting on fraudulent information, sided with his

13        Prosecutor.

14  105.   My attorney moved to modify the release conditions later in motion practice.

15        But again, Mr. Savona fought like hell to oppose it. (See Exhibit 2 in

16        Defendants' motion to dismiss Doc. 29.)

17  106.   As a proximate result of Mr. Savona's fraudulent actions, the new judge, Judge

18        Ray III, sustained Defendant Savona's written opposition, continuing the

19        deprivation of my Fifth Amendment right.

20                              <u>EMOTIONAL DISTRESS</u>

21  107.   While, as a Christian, I'm supposed to be above emotional distress,[17] the fact is

22        that Defendants' actions have caused me to suffer emotionally and physically. I

23        have suffered anguish, humiliation and depression.

24  108.   Moreover, the emotional distress continues to this day. I now have a criminal

25        record, which, unless ordered expunged by this Court, will haunt me for the rest

26        of my life. To quote (retired) Maricopa Superior Court Judge Gary Donahoe,

27

28        [17] "For our light and momentary troubles are achieving for us an eternal glory
      that far outweighs them all." 2 Corinthians 4:17

1    with whom I can empathize as he broke down in tears while testifying about the

2    malicious prosecution he suffered at the hands of (now disbarred ) former

3    Maricopa County Attorney Andrew Thomas, **"Thirty years of trying to build**

4    **a good reputation is gone because of their conduct."**

5  109.  Ths suffering continues as I'm forced to prosecute this civil rights lawsuit to get

6    some justice. (Going on two years now, to the Ninth and back.)

7    <u>DISPARATE TREATMENT OF OTHERS SIMILARLY SITUATED</u>

8  110.  Unless Mr. Savona wishes to testify to the contrary, on information and belief

9    he does not, and never has, withheld exculpatory evidence from anyone. Except

10    me.

11  111.  And likewise, on information and belief Mr. Savona does not, and never has

12    prosecuted a case where he lacked probable cause to pursue the action in

13    question. Except for mine.

14  112.  I was criminally charged for Interfering with judicial proceedings. But when

15    Defendant Savona himself and Defendant Keller lied to the court, claiming I

16    knowingly did something when I didn't, they both violated the same law too.

17    (By lying before the court, they both "Disobey[ed] . . . the lawful order, **process**

18    or other mandate of a court;") Yet Defendant Savona did not charge himself or

19    Mrs. Keller with a crime.

20  113.  Likewise, Mr. Murray falsified two police reports, claiming I knowingly

21    interfered with proceedings by faxing and mailing court documents, even

22    though Judge Ray found that mailing court documents was required legal

23    service/process and that faxing court documents could never be considered

24    violating an injunction. (And therefore, cannot be interfering with judicial

25    process.) Yet Mr. Savona has not charged Defendant Murray with a Class 1

26    misdemeanor (false reporting to law enforcement) as Defendant Savona charged

27    me.

28  114.  And when Mr. Bodine wrote to the Prescott police chief years ago, informing

1  the chief that his wife had lied in a police report about her maiden name to try to

2  incriminate me (claiming it was "Thomas-Morgan" when it was "Eells"), no one

3  charged Mrs. Bodine with false reporting either. In fact, Mr. Murray was in

4  court the day Mrs. Bodine was caught in that lie. Yet he's never filed a police

5  report about it to send up to Mr. Savona.

CLASS OF ONE

7  115.  The Prescott Police Department has demonstrated that it favors one citizen

8  (Mrs. Bodine/Miss Thomas-Morgan) at the expense of another. (Me.) This is

9  not equal protection under the law.

**COUNT ONE**

**MALICIOUS PROSECUTION**

(State claim)

(Defendants Savona, Murray, Keller, Thomas-Morgan, Moore)

14  116.  Plaintiff incorporates each and every allegation above as if fully set forth herein.

15  117.  This is a prima facie tort of malicious prosecution. To wit,

16  a.  the proceedings were terminated in favor of Plaintiff.

17  b.  There was no probable cause for charging plantiff. And Defendants knew it

18  full well.

19  1.  Defendant Savona brought criminal charges against me and prosecuted

20  me all the time knowing he did not have probable cause (and thus, no

21  jurisdiction as Prosecutor) to do so. He said so in the police report he

22  withheld from Plaintiff which dealt with the second fax. (DR 09-

23  11832). Specifically, Savona "denied" the second faxing complaint

24  against me because I "had not been served with the previous complaint

25  by the time of the second action." He further states that after I had been

26  criminally charged for the first fax, "[He] knows now the state will

27  prosecute for a violation in the future." Thus he acknowledges I did not

28  have the requisite mens rea for him to charge me for the second fax.

1           Since I did not know it was a crime to fax the second time, I could not

2           know it was a crime to fax the first. Logically, since I did not have the

3           requisite mens rea for Savona to charge me for the second fax, I could

4           not have had the requisite mens rea for him to charge me for the first.

5           Thus, he had no probable cause to charge me for the first fax because he

6           admitted there was no probable cause to charge me for the second.

7     2.   Defendant Murray provided false information to the Prosecutor.

8           Specifically, he wrote as fact in his police report DR 09-4718 that

9           "Peter Michael Palmer knowingly interfered with the judicial

10          proceedings of the Prescott Justice Court . . . " Only God knows what

11          another person knows. Absent a statement from me (which he did not

12          have), Defendant Murray cannot report as fact that I knowingly

13          interfered with judicial proceedings. In Arizona, "When a person

14          provides false, material information to a prosecutor, an intelligent

15          exercise of the prosecutor's discretion is impossible."

16    3.   Defendant Keller provided Defendant Savona's false information to the

17          Prescott Court as fact and is liable.

18    4.   Defendant Thomas-Morgan falsely reported to Defendant Murray that

19          "she believed that Peter Michael Palmer intentionally sent the fax to the

20          church fax in an attempt to cause her harm." And that "She feels that

21          palmer's [sic] intent was to harass her by turning the church and her co-

22          workers against her." (See DR 09-4718-001, p. 2, last paragraph.)

23    5.   Defendant Moore falsely reported to Defendant Savona (directly or

24          indirectly) that faxing court paperwork was a violation of Rule 5(c) of

25          Arizona Civil Rule of Civil Procedure and thus a violation of the civil

26          injunction. Whereas Judge Ray III said faxing a court order, while not

27          constituting service "was well within the meaning of legal process."

28  c.   The fact the Defendants knew exactly what they were doing but initiated

(and continued) their prosecution without probable cause anyway (and even after Judge Ray ruled that no prima facie crime had been committed) shows bad faith by the Defendants. Instead of pursuing justice, they pursued me. They did this to vex, annoy or wrong me.

d. The fact that Defendants Murray and Savona withheld exculpatory evidence which contravened their probable cause claim, not to mention incriminated their false assertions to the Prescott court, further demonstrates they acted in bad faith.

## COUNT TWO

## VIOLATION OF 42 U.S.C. § 1983 - FOURTH AMENDMENT

(Defendants Savona, Murray, Keller, Thomas-Morgan, Moore)

118. Plaintiff incorporates each and every allegation above as if fully set forth herein.

119. The Fourth Amendment guarantees citizens the right to be free from unreasonable seizure.

120. Plaintiff was unreasonable seized initially and continuously for more than five months. Given that there was no probable cause to bring the overarching criminal complaint against Plaintiff in the first place and that all Defendants committed fraud in bringing criminal charges against Plaintiff, Defendants unreasonable seized Plaintiff (or caused Plaintiff to be unreasonable seized) by issuing (or causing to be issued) a Court Summons against Plaintiff ordering Plaintiff to stop and appear on certain days before the Prescott court under threat of conventional arrest.

## COUNT THREE

## ABUSE OF PROCESS

State claim

(Defendants Savona and Keller)

121. Plaintiff incorporates each and every allegation above as if fully set forth herein.

122. This is a prima facie case of abuse of process. To wit, both Defendants knowingly

and willfully acted to use the judicial process for an ulterior purpose not proper in the regular conduct of proceedings.

123. Since Defendant Savona himself acknowledged he had no probable cause to charge Plaintiff for interfering with a judicial proceeding, Defendant Savona lacked jurisdiction to initiate this prosecution. Specifically, it was not a prosecutorial function to cause Mrs. Kelly to swear out a complaint where no probable cause for a complaint exists. And a false complaint at that.

124. Similarly, Defendant Keller had no cause to swear to the Prescott court what she swore. She simply parroted what Defendant Savona wrote for her without any effort to independently validate what she swore as true upon "information and belief."

125. As soon as Defendant Savona committed this fraud upon the court, violating his oath and the E.R.'s, he also lacked jurisdiction. At that point on, he was effectively barred from acing as an officer of the court in Plaintiff's criminal action.

## **COUNT FOUR**

### **42 U.S.C. § 1983 - DEPRIVATION OF FIFTH AMENDMENT**

(Defendants Murray, Savona, Keller, Thomas-Morgan, Moore)

126. Plaintiff incorporates each and every allegation above as if fully set forth herein.

127. The Due Process Clause of the Fifth Amendment is applicable to the States by way of the Fourteenth Amendment.

128. Defendants deprived Plaintiff of his right to Procedural Due Process.

129. By falsifying a police report (Murray), by knowingly bringing a charge without probable cause (Savona), and by falsely swearing before the Prescott Court that such charge was true (Keller), Defendants deprived Plaintiff of his most basic right, the requirement for probable cause before criminal action is brought. The Colonists fought a war over this when King George was seizing people without cause.

130. Defendants Thomas-Morgan and Moore are culpable for wrongly causing the charges to be filed.

### COUNT FIVE

### 42 U.S.C. § 1983 - DEPRIVATION OF FOURTEENTH AMENDMENT

((Defendants Murray, Savona, Keller, Thomas-Morgan, Moore)

131. Plaintiff incorporates each and every allegation above as if fully set forth herein.

132. The Fourteenth Amendment guarantees the right to a fair trial. This must necessarily extend to all elements of trial, including pretrial, starting with the need for probable cause for pretrial detention.

133. Given that there was no probable cause to bring the overarching criminal complaint against Plaintiff in the first place and that all Defendants committed fraud, in bringing prosecution, all Defendants deprived Plaintiff of a fair trial.

### COUNT SIX

### 42 U.S.C. § 1983 - DEPRIVATION OF FOURTEENTH AMENDMENT

(Defendants Murray, Savona)

134. Plaintiff incorporates each and every allegation above as if fully set forth herein.

135. By withholding exculpatory evidence, Defendants deprived Plaintiff of his Fourteenth Amendment right to due process as clearly stated in *Brady v. Maryland.*

136. Had Plaintiff been given DR 09-11832 in Discover, the Prescott could would have dismissed the charges on a renewed motion to dismiss for demonstrable lack of probable cause.

137. As it was, by withholding the exculpatory evidence, Plaintiff was unreasonable seized right up until days before trial.

### COUNT SEVEN

### 42 U.S.C. § 1983 - "MALICIOUS PROSECUTION"

(Defendants Murray, Savona, Keller, Thomas-Morgan, Moore)

138. Plaintiff incorporates each and every allegation above as if fully set forth herein.

139. Per the Ninth Circuit,"malicious prosecution with the intent to deprive a person of equal protection under the law or otherwise to subject a person to a denial of a constitutional rights is cognizable under § 1983."

140. As such, this is a claim under the Fourteenth Amendment for depravation of my First Amendment Right (to free speech and/or freedom to exercise religion) or Fifth Amendment Right to procedural due process, or both.

141. As to free speech rights, Plaintiff has demonstrated that Defendant Thomas-Morgan, arguably the instigator of all that's happened to me, hates that I believe she's in sin for leaving/divorcing her husband without cause and doesn't want me communicating that to "her" children. Essentially in a Domino effect then, with the help of Defendant Moore, her divorce attorney, she caused Defendant Murray, Savona and Keller to defraud the Prescott Court to deprive me of my due process rights, by bringing a fraudulent charge absent probable cause.

142. As to freedom to exercise religion, this cannot be so easily separated from free speech for the evangelical Christian. It is common knowledge that I am an outspoken Christian. Again, Defendant Thomas-Morgan (and Defendant Moore) hate me. They in turn caused an abuse of the system by causing Defendant Murray, Savona and Keller to deprive me of my due process rights, bringing a fraudulent charge absent probable cause.

143. And/or the goal of the goal of the Defendants was to deprive Plaintiff of my Fifth Amendment right to procedural due process by falsifying reports and charging Plaintiff with a crime even though Defendants knew they had no probable cause.

144. If it's not religious animus behind all this, then it is "Class of One" discrimination, a.k.a. "Selective Prosecution." For I clearly have been targeted for prosecution by Defendants and treated differently than others similarly situated.

## **COUNT EIGHT**
### **42 U.S.C. § 1983 - DEPRIVATION OF SECOND AMENDMENT**

(Defendant Savona)

145. Plaintiff incorporates each and every allegation above as if fully set forth herein.

146. Given that there was no probable cause to bring the overarching criminal complaint against Plaintiff in the first place, Defendant is automatically liable for any harm that accrues from his initial bad act.

147. The Second Amendment has now been recognized as an individual right by the U.S. Supreme Court. It has long been held as an individual right in the State of Arizona.

148. The Prescott court initially deprived Plaintiff of his Second Amendment constitutional right as an unspoken release condition at Plaintiff's first pretrial appearance. As soon as Plaintiff and his attorney read the judge's written Order, we returned to the courtroom (within minutes) to challenge the Second Amendment deprivation.

149. Defendant Savona did not have cause to object to Plaintiff's oral (and later written) motion to modify the release condition to restore Plaintiff's Second Amendment right because Defendant Savona did not have probable cause to detain Plaintiff to charge him criminally in the first place. Thus Defendant Savona lacked jurisdiction to argue to deprive Plaintiff of his Second Amendment right when the Prescott court turned to him for input.

150. Plaintiff suffered the deprivation of his Second Amendment right pretrial for more than five months.

## COUNT NINE

## 42 U.S.C. § 1985(3) - CONSPIRACY

(Defendants Savona, Murray, Thomas-Morgan, Moore, Keller)

151. Plaintiff incorporates each and every allegation above as if fully set forth herein.

152. Plaintiff alleges:

    a.   a conspiracy, starting with Thomas-Morgan to Murray, then Murray to Savona. Savona then conspired with Thomas-Morgan and Moore, the latter

who provided the lynch pin (literally) of the false Rule 5(c) violation against Plaintiff. Last, Savona conspired with Keller to defraud the Prescott court.

b.   the conspiracy was for the purpose of depriving Plaintiff either or any of his First, Fourth, Fifth, or Fourteenth Amendment rights.

c.   the conspirators acted to further the conspiracy by initiating a criminal complaint by first falsely informing the Prescott prosecutor Savona that Plaintiff knowingly violated a court order. Then, when Savona needed more to make a case, Defendant Moore suggested a Rule 5(c) of the Arizona Rules of Civil procedure as quasi-legal theory to prosecute Plaintiff. After Savona had what he thought he needed, he conspired with Keller to lie to the court.

d.   As a result of their conspiring together, they synergistically caused deprivation of Plaintiff's various constitutional rights and injured him emotionally and economically. No single conspirator, acting alone, could have caused Plaintiff this harm.

## COUNT TEN

## 42 U.S.C. § 1986 - ACTION FOR NEGLECT TO PREVENT

(Defendants Savona, Murray, Thomas-Morgan, Moore, Keller)

153. Plaintiff incorporates each and every allegation above as if fully set forth herein.

154. All of the conspirators above knew that what they were doing was wrong. Any of the conspirators above could have acted to prevent the wrong. Among items in their power, they could have contacted Plaintiff (or his attorney) with the information that Defendant Savona had withheld exculpatory evidence showing Plaintiff did not have the mens rea for the crime charged; they could have contacted Judge Markham and/or other law enforcement authorities to report a fraud on the court; they could have gone to the media and reported their story; they could have recanted their statements.

155. By refusing to act to prevent the various constitutional deprivations to Plaintiff, every person in the conspiracy is liable for damages incurred by Plaintiff.

1

**COUNT ELEVEN**

2

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

3

(Defendants Savona, Murray, Thomas-Morgan, Moore, Keller)

4

156. Plaintiff incorporates each and every allegation above as if fully set forth herein.

5

157. The Defendants' conduct, as described above, was extreme and outrageous.

6

158. The Defendants' conduct was intentional and reckless.

7

159. The Defendants intended to harm—and did harm—Plaintiff. As such, Plaintiff

8

has suffered severe emotional distress as a result of Defendants' action. (And also,

9

as above, Defendants' inaction.)

10

**COUNT TWELVE**

11

**FALSE LIGHT INVASION OF PRIVACY**

12

(Defendants Savona, Murray, Thomas-Morgan, Moore, Keller)

13

160. Plaintiff incorporates each and every allegation above as if fully set forth herein.

14

161. Defendants knowingly made statements that were untrue and intended to

15

misrepresent Plaintiff's character, history, activities and beliefs.

16

162. Defendants also made comments or suggestions that created a false implication

17

about plantiff.

18

163. These false and/or misleading statements were made public by way of the court

19

system. (If nothing else, I now have a criminal record.)

20

164. Defendants knew (or reasonably should have known) that their statements

21

regarding Plaintiff were false and/or represented him in a false light.

22

**COUNT THIRTEEN**

23

**NEGLIGENT SUPERVISION FAILURE TO SUPERVISE**

24

(Defendant City of Prescott)

25

165. Plaintiff incorporates each and every allegation above as if fully set forth herein.

26

166. The City of Prescott has no oversight protocol to know if Mr. Savona, Mr.

27

Murray or Mrs. Keller perjure themselves. Nor does the City care. The City

28

ultimately relies on the word and honor of these employees that they are carrying

1     out their duties as they should.

2   167. As such, the City has ceded its final policy making authority regarding probable

3        cause determinations/initiations of criminal complaints to Mr. Savona, Mr.

4        Murray and Mrs. Keller individually.

5   168. As such, the City is liable for their actions as its employees.

6                             **ALL COUNTS**

7              **PUNITIVE DAMAGE STATEMENT**

8                   (All Defendants)

9   169. The acts of the Defendants toward Plaintiff amount to conduct that shocks the

10        conscience, especially since some are officers of the court and since they violated

11        the most basic principles of our legal system which the Founders died for. The

12        actions of the Defendants were entered into with an evil mind and therefore,

13        punitive damages are appropriate.

14

15   **WHEREFORE,** Plaintiff prays for Judgment against Defendants, and each of them, as

16   follows:

17      A.   For compensatory damages of $17,100 ($5700 x 3) to be paid to the charities

18   of Plaintiff's choice, plus special and incidental damages in such a sum as may be

19   proven at trial;

20      B.   For punitive damages in an amount to be proven at trial;

21      C.   For costs for the suit;

22      D.   For attorney's fees or equivalent compensation;

23      E.   For Declaratory relief, ordering that the entire record of case No.

24          2009030317C in the Prescott Justice Court be expunged and likewise, the

25          police reports in the Prescott Police Department reporting plantiff's faxing

26          and mailing court papers as crimes be expunged from the record so that my

27          good name may be somewhat restored.

28      G.   For other such relief as this Court deems just and proper.

1    SUBMITTED this 2nd day of January 2013

2

3                                              By: _____
                                               P. Michael Palmer
4                                              18402 N. 19th Ave., #109
                                               Phoenix, AZ 85023
5                                              602-513-3738

6    Certificate of Service

7    Pro se Plaintiff has previously filed a Motion to Disqualify opposing counsel Thomas Lloyd
     for many of the reasons cited herein.
8
     Therefore, copy of the foregoing mailed under protest this day to:
9
     Mr. Thomas Lloyd
10   Prescott Legal Department
     221 S. Court Street
11   Prescott, AZ 86303

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# The Daily Courier

*Monday, May 30, 2011*

## He fought the law, and ... he won; City of Prescott settles in 4th Amendment suit

<u>Scott Orr</u>
The Daily Courier

*Monday, May 30, 2011*

PRESCOTT - Mike Palmer is a staunch defender of the U.S. Constitution, so when he felt his Fourth Amendment rights were violated, he took the Prescott police to court and won a settlement from the city.

The Fourth Amendment is the one that protects against unreasonable searches and seizures and requires a warrant, supported by probable cause, signed by a judge before law enforcement officers can search. It has also been held to extend to protect individuals from being searched or answering questions when an officer does not have probable cause to do so.

Palmer filed a complaint after a Prescott police officer, Casey Cook, came to a house where Palmer was visiting in January 2009, and began asking him questions. Palmer claims Cook did this because Cook is acquainted with a person who was trying to serve Palmer with a court document and wanted to help by alerting the process server to Palmer's whereabouts.

Cook was not dispatched to the house, which was outside the Prescott city limits. He'd received a personal phone call and went to the house on his own, records show.

The officer asked for Palmer, who came to the door. The conversation, which Palmer recorded, went like this:

COOK: Will you please step outside?

PALMER: Am I under arrest?

COOK: No.

PALMER: Okay, no.

COOK: No? Do you have ID on you?

PALMER: No, I do not.

COOK; By law, you have to be able to provide me with ID.

PALMER: I don't believe that's correct.

COOK: It is, actually.

1

PALMER: Okay, if you want to arrest me for that, it's fine.

Cook did not arrest Palmer, but instead insisted on getting information from Palmer that he felt he did not need to divulge, such as his full name, address, birth date and Social Security number.

At this point, Palmer tried to close the door, but Cook stopped it with his foot.

COOK: You can't do that. You're being detained.

Palmer asked Cook what his probable cause for detaining him was.

The officer said he needed to find out who Palmer was, but Palmer called this a "pretext, because he came to the door knowing my name."

Officer Cook called for his supervisor, Sgt. Chad Slocum.

Meanwhile, the conversation continued:

PALMER: You're investigating something? Is it a crime you're investigating?

COOK: Yes, sir.

PALMER: Is it a felony crime?

COOK: I'm not sure.

Palmer asked his friend to look up the Arizona law on the Internet and print it, which he did. He acquiesced and gave Cook his name, seeing that state law did, in fact, require him to state his name.

Cook then asked for his date of birth as well. Again, Palmer refused, citing the same state law, A.R.S. 13-2412.

Slocum arrived and said they were going to arrest Palmer.

"Since it was a Friday afternoon, and I knew I'd likely have to sit in jail for the weekend" if he continued to refuse, he gave them the information they wanted.

The two cops left without arresting Palmer.

Palmer filed a lawsuit, naming the City of Prescott, the police chief, several officers and others as defendants, alleging that his rights were violated. Acting as his own attorney, he spent two years going through the processes of obtaining documents and evidence and claims the city stalled on fulfilling those requests.

Tom Lloyd, chief assistant city attorney, said that an Internal Affairs investigation was opened, but not completed because the case went to litigation.

The city settled with Palmer for $3,750.

Lloyd said he was "not at liberty to discuss" why the city settled the lawsuit.

Palmer got considerably less than the $10,000 he'd asked for. "I joke about it paying a dollar an hour for my time," he said.

He had the settlement check made out to a Christian charity.

2

# EXHIBIT 2

9 × 12

3/13/09

Officer Murray -

Obviously I have
+ read this. I have not
ceived a fax @ work yet
ther.

If I need to act → or take
anything
anything, please let me to my lawyer.
ow. Thank you!

M   B

Dissemination is restricted to
Criminal Justice Agencies Only
CITY PROSECUTOR